UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED
MAY 06 2005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| CAROL L. ROBINSON, | CIV 03-4128 |
| Plaintiff, | |
| -vs- | MEMORANDUM OPINION AND ORDER |
| JOHN E. POTTER, Postmaster General, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff Carol Robinson brings this case under the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), alleging disability discrimination and retaliation.. Defendant moved for summary judgment and the motion has been fully briefed. The Court heard oral arguments on the motion during the pretrial conference on April 18, 2005. For the reasons set forth below, Defendants' summary judgment motion will be denied as to the discrimination claim and granted as to the retaliation claims.

## BACKGROUND

Plaintiff was employed by the United States Postal Service ("Postal Service") from May 1983 to May 1989. She began work as a LSM operator in Sioux Falls, South Dakota. An LSM operator sorts mail by keying in the zip code and other codes on a sorting machine as letters pass by the operator. This job involves repetitive motion to key in the numbers, with operators being expected to key in 50 to 60 letters per minute for one-half hour. After each one-half hour, the operator alternates with 15 minutes of non-keying work.

In 1987, while working for the Postal Service in Sioux Falls, Plaintiff developed a sore right wrist. Her doctor determined that she had tendinitis and initially ordered that the amount of time she could key in zip codes was 4 hours per day. Later, Plaintiff's doctor, Dr. MacRandall, ordered that she not key in zip codes for any length of time until her wrist healed. Plaintiff notified Dan Weber, the safety director, of her tendinitis. Weber notified Plaintiff's supervisors and her work assignment was changed to another job within the Postal Service that did not involve keying.

Plaintiff completed a notice of injury regarding her wrist soreness to preserve her right to worker's compensation in the event the soreness did not heal as anticipated. But Plaintiff never made any request for workers' compensation benefits.

In June or July 1987, the Postal Service announced that city letter carriers would be hired and that clerk craft employees could transfer to the carrier craft. In July 1987, Plaintiff requested a transfer to the carrier craft and the request was granted. The carrier craft allowed Plaintiff to work during the day, rather than the evening shift she was working in the clerk craft. Carol Kreager, a Human Resources Specialist, was involved in Plaintiff's transfer from the clerk craft to the carrier craft.

In April 1988, Plaintiff transferred to Hastings, Nebraska, as a manual distribution clerk. In May 1989, she transferred to Huntsville, Alabama, as a LSM operator. She resigned from the Postal Service in September 1989 to run the business her husband and she had purchased in Alabama. After the Robinson's sold their business in Alabama, they returned to Sioux Falls.

In August 1991, Plaintiff sent a letter to the Postal Service requesting reinstatement as an employee of the Postal Service. Due to a hiring freeze from August 1991 to May 1993, however, no career employees were hired in the clerk craft. In December 1992, after reading an announcement in a local newspaper, Plaintiff believed the Postal Service was hiring. Plaintiff sent a letter to the Postal Service, dated December 18, 1992, again requesting reinstatement as a Postal Service employee. In response to her December 18, 1992 letter, Plaintiff received a letter from Carol

2

Kreager, Human Resources Officer for the Postal Service, stating, "Your request for reinstatement is still on file. We are sorry the Argus Leader article was very misleading but we are not hiring at the current time. We are transferring employees from other areas of the Postal Service to fill some of the vacancies we currently have." (Doc. 83, Ex. E.)

Another letter, dated February 11, 1993, was sent by Plaintiff to the Postal Service requesting reinstatement. The letter was addressed to Ms. Joan Marshall, Kreager's immediate supervisor at that time. In the letter, she informed the Postal Service that she would like to return to work as either a clerk or carrier and that she would consider "either a career position or a TE position." (Doc. 83, Ex. F.) In response to Plaintiff's letter, the Manager of Human Resources, Joan Marshall, wrote a letter to Plaintiff stating, "We are in receipt of your February 11, 1993 letter requesting reinstatement consideration as a career employee or a transitional. Your request will be kept on file with your previous request for consideration if hiring occurs." (Doc. 83, Ex. F.)

Plaintiff contends that her February 11, 1993, letter requested either career or "temporary" employment. In her Affidavit, Plaintiff states that temporary employees were hired between August 1991 and May 1993, despite the hiring freeze. She also states in her Affidavit that some temporary employees were hired after the hiring freeze was lifted, but before Plaintiff was rehired in August 1993.

Kreager informed Plaintiff in April 1993 that she had requested Plaintiff's Official Placement File ("OPF"), which is the permanent employment record of Postal Service employees. The OPF was requested to allow it to be reviewed in connection with Plaintiff's request for reinstatement. The normal process for reinstatement is for the Human Resources department to review the OPF for any disciplinary problems, attendance problems and work performance. There is only one written request for Plaintiff's OPF in the record, which is dated August 1993.

Kreager has been employed by the Postal Service for more than 34 years, more than 24 of which have been in Human Resources. Her responsibilities include hiring employees for the Postal

3

Service in all of South Dakota, administering employee benefits, retirements, career counseling, unemployment compensation, training and other related matters. During Plaintiff's employment, Kreager personally assisted Plaintiff with a special maternity leave request and was involved in Plaintiff's transfer from the clerk craft to the carrier craft in 1987.

The hiring freeze that had been in effect since 1991, was lifted in 1993 and hiring of career employees resumed in May or June 1993. On June 8, 1993, Plaintiff met with Kreager. During this meeting, Plaintiff was informed that her OPF had not yet been received, but that Kreager had received some information from the Omaha office that Plaintiff had carpal tunnel syndrome. Plaintiff states in her Affidavit that Kreager informed her during this June 8, 1993 meeting that Plaintiff "would not be considered for any employment by the Post Office because of [Plaintiff's] 'medical problem.'" (Doc. 83, at ¶ 12.) In her deposition, Plaintiff testified that Kreager told her "'Because you are disabled, you will never work for the Post Office. We will never hire you at the Post Office.' And that was I am assuming for any position." (Robinson Depo. at p. 43.) Defendant admits that Kreager asked Plaintiff about her wrist during the June 8, 1993 meeting, and states that Kreager was concerned about whether Plaintiff might re-injure herself.

After the June 8, 1993 meeting, Plaintiff sought a medical examination by Dr. MacRandall regarding her prior wrist problems. Dr. MacRandall examined Plaintiff and found no current indications of tendinitis. He wrote a letter on Plaintiff's behalf, stating the results of his examination and making it clear that at no time had Plaintiff suffered from carpal tunnel syndrome while under his care. Plaintiff sent the letter from Dr. MacRandall along with a letter, dated June 25, 1993, to Kreager reiterating her desire for reinstatement and explaining that although she had once suffered from tendinitis, she had not experienced any recurrence of wrist problems and had never been diagnosed with carpal tunnel syndrome. A copy of the June 25, 1993 letter was sent to Don Logue, Sioux Falls Postmaster, and David Heckenlively, Sioux Falls Clerk Union President. Plaintiff sent a similar letter, dated July 19, 1993, to then Postmaster General Marvin Runyon in Washington, D.C.

Within three days of receiving Plaintiff's June 25, 1993 letter, Kreager began processing Plaintiff's reinstatement request. Although normal procedure would have been to wait until the OPF was received, Kreager did not wait for the file because she was familiar with the Plaintiff's work and training at the Postal Service in Sioux Falls and gathered the necessary information from the other offices over the telephone. The Plaintiff's OPF was not received in Sioux Falls until March 1994. Like all individuals who had not worked for the Postal Service in the previous year, Plaintiff was required to have a physical and drug screening before she could be reinstated. It is not unusual for a reinstatement request to take 90 days to process within the Postal Service.

Plaintiff was notified by letter dated July 27, 1993 that she was being considered for the position of part-time flexible distribution clerk, machine trainee. (Doc. 83, Ex. K). She was informed that she needed to complete and return two forms to the Human Resources Office by August 2, 1993. On July 30, 1993, Plaintiff personally delivered the completed forms to the Postal Service. The first day of Plaintiff's re-employment with the Postal Service was August 21, 1993.

There were 17 employees hired as part-time flexible clerks between May 29, 1993, and August 7, 1993. Of the 17 employees hired, the first six were transfers to Sioux Falls from other facilities. The next 11 employees were new hires who had passed a pre-hire test in or around October 1992. Plaintiff was the next person on the seniority list with a hire date of August 21, 1993.

Approximately one year later, on August 30, 1994, Plaintiff filed an Equal Employment Opportunity ("EEO") claim against the Postal Service, claiming that she was discriminated against on the basis of a perceived handicap. In 1997, Plaintiff filed a second EEO claim, contending that she was not hired for the position of Human Resources Associate under Vacancy Announcement 97-11 issued in March 1997 in retaliation for her filing of the first EEO claim. This was an entry level job, but was a management position. Plaintiff was required to complete a Form 991 to apply for this position. A pamphlet is available from the Postal Service to help employees complete a Form 991, and Plaintiff did receive a copy of the pamphlet. In addition, the Postal Service offers both training classes on how to complete a Form 991 and critiquing of applications by the Human Resources

5

Department to help the applicants with the forms. Plaintiff was unable to attend the classes due to conflicts with her work schedule and she did not take advantage of the assistance provided by the Human Resources Department in light of her claims against Kreager.

When filling out a Form 991, applicants are encouraged to follow what is known as the "STAR" format to demonstrate their problem solving skills as they relate to knowledge, skills and abilities ("KSA's") required to perform successfully at the particular job they are seeking. The STAR format involves the applicant describing a situation or task that has presented itself to the applicant in the past; the action taken by the applicant to solve the situation; and the result of the action taken. The STAR format is recommended, but is not required. But applications following the STAR format are ranked higher, since the reviewers are instructed to review the applications for statements of the problem-solving skills related to the KSA's required to perform the job at issue.

The Form 991 submitted by Plaintiff for the March 1997 vacancy did not follow the STAR format. The selection panel reviewed 14 applications for the position and Plaintiff's was ranked last. Plaintiff was not selected to interview for this position. The three persons on the selection panel were Joanne Scholes, JoAnn Baker and Lorrie Bucholz, who were all employees in the Human Resources Department.

Plaintiff makes allegations that the selection panel for the Human Resources Associate position for the vacancy in March 1997, were "less than impartial causing Plaintiff to be discriminated against due to her previous EEO complaint." (Doc. 81, ¶ 27.) She alleges that the selection panel's employment in the human resources department gave them knowledge of Plaintiff's pending EEO complaint against the Postal Service involving Kreager.

In November 1997, there was a second vacancy for a Human Resources Associate under Vacancy Announcement 97-59, which Plaintiff again applied for. This was the same position as the March 1997 vacancy, which was again open because the person hired under the March vacancy took another position within the Postal Service. There were six candidates, including Plaintiff, for this

6

position. Plaintiff, along with two other candidates, were given interviews for this position. Plaintiff claims she was the best qualified applicant for the November 1997 position because she had a college degree, experience with statistical analysis and processing confidential information. This position involved voluminous filing, photocopying and inputting of information into a computer database. Neither a college degree nor statistical analysis skills were required for this position. The person selected for this position would have worked in the same department as Kreager, but would not have worked under Kreager's supervision.

The three persons on the selection panel for this position were Shari Reed, Dan Weber and Nancy Parr. The candidates' responses to a pre-selected set of interview questions were independently rated by the panel members on a scale of zero to ten, with ten being the best score. After the interviews, the panel members tallied their individual scores, with the individual selected for the job receiving the highest score of 645 points, the second highest getting 597 points, and the Plaintiff receiving 523 points. Each of the selection panel members independently ranked the candidates in the same order, with Plaintiff being ranked third. Plaintiff was considered over-qualified for this position and each of the selection panel members rated her interview last among the three candidates.

At the time of the Plaintiff's interview, Dan Weber was aware that Plaintiff was involved in an EEO claim, but did not know who she made a claim against, and he testified Plaintiff's involvement in an EEO claim played no part in his decision regarding the November 1997 vacancy. Shari Reed had heard rumors that one of the candidates had filed an EEO complaint because she had not previously chosen for the position, but she did not know the identity of the candidate and she testified that she did not pay any heed to the rumor. Nancy Parr had no knowledge of an EEO claim by the Plaintiff. Prior EEO activity of the candidates was not discussed amongst the selection panel members.

Count 1 in Plaintiff's Complaint is for discrimination for a perceived disability, pursuant to the Rehabilitation Act, which Plaintiff alleges resulted in a delay in her reinstatement causing her

to suffer a loss of seniority position, loss of wages, humiliation, anxiety and emotional pain. Count 2 of the Complaint alleges a claim of retaliation for the rejection of her application for the March 1997 vacancy in the human resources department. Count 3 of the Complaint alleges a second claim of retaliation for the rejection of her application for the November 1997 vacancy in the human resources department.

## DISCUSSION

In ruling on a motion for summary judgment, the district court must take the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable factual inferences. *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 615 (8th Cir. 1997). Summary judgment is appropriate only if there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See id.* Because discrimination cases often turn on inferences rather than on direct evidence, the courts are particularly deferential to the nonmoving party. *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1205 (8th Cir. 1997).

### A. Rehabilitation Act Disability Discrimination - Count 1

The Rehabilitation Act provides, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, ... be subjected to discrimination ... under any program or activity conducted by ... the United States Postal Service." 29 U.S.C. § 794(a) (1999). To establish a claim of discrimination under the Rehabilitation Act, Plaintiff must show that, (1) she was "disabled" as defined in 29 U.S.C. § 705(20)(B); (2) she was "otherwise qualified"; and (3) that she was the victim of discrimination solely because of her disability. *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004). "Rehabilitation Act claims are analyzed in a manner similar to [Americans with Disabilities Act] claims except that the Rehabilitation Act imposes a requirement that a person's disability serve as the *sole* impetus for a defendant's adverse action against the plaintiff." *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1029 n.5 (8th Cir. 1999). An individual with a disability is defined as "any person who – (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B) (1999). The regulations promulgated in

8

conjunction with the Rehabilitation Act define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii) (2005).

"[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521-22 (1999). To establish discrimination on the basis of a perceived disability, Plaintiff must show that "defendant treated plaintiff adversely because it regarded [her] as having an impairment *that substantially limits one or more major life activities.*" *Weber v. Strippit, Inc.*, 186 F.3d 907, 915 (8th Cir. 1999) (emphasis in original). Plaintiff alleges that Defendant regarded her as disabled due to carpal tunnel syndrome, with which Plaintiff has never been diagnosed. Although it is not clear from Plaintiff's Complaint, it appears the only major life activity she is alleging is that of working.

The Equal Employment Opportunity Commission ("EEOC") defines "substantially limits," with respect to the major life activity of working, as: "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working." 29 C.F.R § 1630.2(j)(3)(i); *see* 39 C.F.R. § 255.5 (Postal Service regulation stating EEOC regulations contained in 29 C.F.R. part 1614 apply to employment with the Postal Service); 29 C.F.R. § 1614.203 (EEOC regulation adopting standards contained in regulations promulgated under the ADA at 29 C.F.R. part 1630). "To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills ... are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999).

9

The evidence produced by Plaintiff in support of her disability discrimination claim is in the form of her deposition testimony and her affidavit. Plaintiff's Affidavit states: "The Defendant's agent and employee, Carol Kreager, told [Plaintiff] on the 8[th] day of June, 1993 that [Plaintiff] would not be considered for *any employment by the Post Office* because of [Plaintiff's] 'medical problem.'" (Doc. 83, ¶ 12 (emphasis added).) In her Affidavit, Plaintiff cites to her testimony in the EEOC proceedings, on August 8, 2000, on pages 30-31 of the transcript, where Plaintiff was being asked about her meeting with Kreager on June 8, 1993:

> Q. And what happened?
> A. Ms. Kreager greeted me cordially, invited me in the room, had me sit down, and she told me that she still hadn't gotten my file yet, but she had found a record somewhere – she had pulled up a record somewhere from Omaha or something and she said, "You had carpal tunnel when you worked here before. We are only hiring LSM operators. We'll never reinstate anyone with carpal tunnel syndrome and you will never work at the post office again."
> Q. Did you have a response to that?
> A. I basically had no response. She was very – her mannerisms and that were very authoritative. You're not going to work here, we're not going to have you, and I was devastated. I had been looking for work for two years and now she tells me you're not going to work because you have something you don't have.

(Doc. 83, Ex. A.) In addition, Plaintiff cites to her deposition testimony in the present case, taken on January 21, 2004, where Plaintiff was asked to name the Postal Service persons that discriminated against her:

> A. The person that verbalized it to me was Carol Kreager on June 8 when she said, "Because you are disabled, you will never work for the Post Office. We will never hire you at the Post Office." And that was I am assuming for any position. That was – and then that was for the reinstatement. That's the only actual statement of any discrimination that was really made on that.
> Q. And that was on the basis of her –
> A. Her perception that I was disabled and unable to work for the Post Office in any capacity.

(Robinson Depo. at p. 43, Doc. 83, Ex. J.) There is no evidence of Plaintiff's reinstatement request being processed by the Postal Service from the date of this meeting until after Plaintiff submitted her letter explaining that she never had carpal tunnel syndrome and attaching her doctor's report to that

10

effect. The Court finds that Plaintiff's evidence on the issue of being precluded from a broad class of jobs, rather than solely being precluded from being a LSM operator, is certainly not strong evidence. She did testify, however, that Kreager informed her she would not work for the Postal Service in any capacity because of the information Kreager had about Plaintiff having carpal tunnel syndrome. Taking all reasonable factual inferences in this case in the light most favorable to the Plaintiff, Plaintiff's deposition testimony, combined with her testimony in the EEOC proceedings and her Affidavit, are enough and sufficient to create a genuine issue of material fact for trial on whether Defendant regarded Plaintiff as disabled in that she was substantially limited in the major life activity of working. *See Sutton*, 527 U.S. at 489 (explaining that an individual may be "regarded as" having a disability if "a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities.").

B.      Retaliation - Counts 2 and 3

Plaintiff asserts she was retaliated against on two occasions when her application for Human Resources Associate were rejected. The Court utilizes the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to analyze retaliation claims under the Rehabilitation Act. *See Sherman v. Runyon*, 235 F.3d 406, 409-10 (8th Cir. 2000); *EEOC v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003). Plaintiff must first establish a prima facie case of retaliation. *See Kohler*, 335 F.3d at 772. "To present a prima facie case of retaliation, a plaintiff must show that he engaged in protected conduct, that he suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). If Plaintiff establishes a prima facie case of retaliation, the defendant must rebut it by presenting evidence of a legitimate, non-retaliatory reason for the action taken against the plaintiff. *See Kohler*, 335 F.3d at 772-73. If the Defendant rebuts Plaintiff's prima facie case, "the plaintiff must then establish that the defendant's proffered reason was a pretext and that illegal retaliation was a motivating reason for the defendant's decision." *Id.* at 773.

Plaintiff engaged in protected conduct by filing the initial discrimination charge with the EEOC and by filing the first retaliation claim with the EEOC. The adverse employment action

11

alleged by Plaintiff is that she was denied the position of a Human Resources Associate on two separate occasions, once relating to the March 1997 vacancy and again for the November 1997 vacancy. The remaining element of her retaliation case is to show that her rejection was causally linked to the filing of her EEOC complaints. The causal element for the two retaliation claims will be discussed separately below, followed by a discussion of the remainder of the *McDonnell Douglas* burden-shifting test for each claim.

Regarding the first retaliation claim, all three members of the selection panel submitted affidavits during the EEO investigation, which are also in the record in this case, declaring that they had no knowledge of Plaintiff's EEO activity at the time they served on the selection panel for the March 1997 vacancy. Plaintiff has not produce any evidence to establish that any one of the three individuals on the selection panel were aware of Plaintiff's pending EEO complaint against Kreager. The Affidavit submitted by Plaintiff merely states that "[t]he selection committee for the [March 1997 vacancy] was headed by Joan Scholes who worked with Carol Kreager in the Human Resources Department and participated in employment case files with Mrs. Kreager." (Doc. 83, ¶ 34.) In her response to Defendant's Statement of Material Facts, Plaintiff contends that the panel was tainted because of the members' "close working relationships with Carol Kreager," and that they were aware of Plaintiff's EEO claim because those "panel members job duties relating to the human resources department ... gave them knowledge of the prior and ongoing EEOC case." (Doc. 81, ¶ 27.) Thus, Plaintiff has made conclusory allegations that the three selection panel members for the March 1997 vacancy had knowledge of Plaintiff's EEO claim, but even giving the Plaintiff the benefit of all reasonable factual inferences, she has produced no evidence of any such knowledge. Plaintiff is not entitled to rely on conclusory statements in her Affidavit in resisting Defendant's summary judgment motion. *See Jeseritz v. Potter*, 282 F.3d 542, 545-46 (8th Cir. 2002) (holding that the plaintiff could not rely on conclusory statements in his affidavit to establish a genuine issue of material fact). Accordingly, Plaintiff has not established a prima facie case of retaliation relating to the March 1997 vacancy. *See Mitchell v. Iowa Protection and Advocacy Serv., Inc.*, 325 F.3d 1011, 1014 (8th Cir. 2003) (holding the plaintiff failed to establish a causal connection between her

protected activity and her termination where the decision makers were not aware of the protected activity that the plaintiff alleged was the basis for the retaliation against her).

Even if Plaintiff had established a prima facie case of retaliation relating to the March 1997 vacancy, Defendant has presented evidence of a legitimate, non-retaliatory reason for rejecting Plaintiff's application for Human Resources Associate. The application submitted by Plaintiff was ranked last out of 14 applications and Plaintiff was not given an interview. Failure to follow the favored STAR method for completing the applications is a legitimate, non-retaliatory reason for rejecting her application. Plaintiff has presented no evidence that the ranking of her application was a pretext. As mentioned above, Plaintiff has produced no evidence that any of the individuals ranking the applications had any knowledge of Plaintiff's EEO claims against the Postal Service, precluding a finding that illegal retaliation was a motivating reason for the Defendant's rejection of her application for the March 1997 vacancy.

The second claim of retaliation is for the November 1997 vacancy. This was the same position as the March 1997 vacancy for a Human Resources Associate, which became vacant again when the person hired for the March 1997 vacancy accepted another position. There were only six applicants for the November 1997 vacancy. Plaintiff was given an interview, along with two other people. The three persons on the selection panel for this position were Shari Reed, Dan Weber and Nancy Parr.

At the time of the interviews for the November 1997 vacancy, Dan Weber was aware that Plaintiff was involved in an EEO claim, but he did not know the identity of the other person involved in the claim. Weber testified that Plaintiff's involvement in an EEO claim played no part in his decision regarding the November 1997 vacancy. Shari Reed had heard rumors that one of the candidates had filed an EEO complaint because she had not previously been chosen for the position, but she did not know the identity of that candidate and she testified that she did not pay any heed to

13

the rumor. Nancy Parr had no knowledge of an EEO claim by the Plaintiff. Prior EEO activity of the candidates was not discussed amongst the selection panel members.

It is Plaintiff's burden to show that her rejection was causally linked to the filing of her EEO complaints. The second retaliation claim is different from the first claim in the sense that at least one of the panel members knew Plaintiff had filed an EEO claim. Although it is not clear that this knowledge by the selection committee is sufficient to establish the required causal link, the Court will assume Plaintiff has established her prima facie case and will apply the remainder of the *McDonnell Douglas* burden-shifting test.

The Court finds the Defendant has presented evidence of a legitimate, non-retaliatory reason for denying Plaintiff the position of Human Resources Associate for the November 1997 vacancy. After the interviews, the panel members tallied their individual scores, with the individual selected for the job receiving the highest score of 645 points, the second highest getting 597 points, and the Plaintiff receiving 523 points. All candidates were asked the same questions and their responses were independently evaluated by the panel members. Each of the selection panel members independently ranked the candidates in the same order, with Plaintiff being ranked third based upon her interview. Plaintiff was considered over-qualified for this position and each of the selection panel members rated her interview last among the three candidates. The primary duties of this position included photocopying and filing, which did not require Plaintiff's degree of education or work experience.

The final issue is whether Plaintiff has produced evidence that the Defendant's proffered reason was a pretext and that illegal retaliation was a motivating reason for the Defendant's decision. Plaintiff has presented no evidence of any retaliatory statements made by any of the selection panel members and there is no evidence of motive to retaliate against Plaintiff by any of the three selection panel members. She has presented no evidence of personal animosity amongst her and any of the selection panel members. Plaintiff had not made any allegations of discrimination by any of the three decision makers on the selection panel for the November 1997 vacancy. Rather, Plaintiff states

14

that Dan Weber, the one selection panel member that knew she filed an EEO claim, had a "dry sense of humor" similar to the Plaintiff's and that the two of them "often joked and bantered during their conversations," and that although they don't socialize outside of work "Dan and [Plaintiff] always converse whenever we see each other." (Plaintiff's Affidavit, Doc. 83, ¶ 39.) Weber testified during the EEO proceedings in this case that, at the time he interviewed Plaintiff for the November 1997 vacancy, he did not know who Plaintiff had made allegations of discrimination against and Plaintiff produced no evidence to contradict Weber's testimony. (Doc. 83, Ex. B at p. 207.) Significantly, Nancy Parr, the one selection panel member who had no knowledge of Plaintiff's EEO claims at the time of the interviews, independently ranked Plaintiff in the same position as Weber and Reed based upon Plaintiff's interview. *See Mitchell*, 325 F.3d at 1014 (holding the plaintiff failed to establish a causal connection between her protected activity and her termination where the decision makers were not aware of the protected activity that the plaintiff alleged was the basis for the retaliation against her). In sum, Plaintiff has produced no evidence to show that the interview scores rating Plaintiff last out of the candidates interviewed for the November 1997 vacancy were a pretext and that retaliation for Plaintiff's EEO activity was a motivating reason for the decision to not hire Plaintiff for that position.

## CONCLUSION

The Court will deny Defendant's summary judgment motion regarding the discrimination claim under the Rehabilitation Act, as stated in Count 1 of the Complaint, and will grant the motion on Plaintiff's retaliation claims, as stated in Counts 2 and 3 of the Complaint. Accordingly,

IT IS ORDERED:

1. That Defendant's Motion for Summary Judgment, Doc. 51, is granted as to Plaintiff's retaliation claims alleged in Counts 2 and 3 of the Complaint and is denied as to Plaintiff's discrimination claim alleged in Count 1 of the Complaint.

2. That Plaintiff's Motion to Strike, Doc. 88, is denied and Plaintiff's Motion to Respond to Defendant's Reply Brief, Doc. 88, is granted. Plaintiff's

response was considered by the Court in ruling on the Defendant's summary judgment motion.

Dated this _____ day of May, 2005.

BY THE COURT:

*[signature]*

Lawrence L. Piersol
Chief Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: *Shelly Margulies*
   (seal)     DEPUTY